**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                                                                    No. 21-CR-00591 MV

GEORGE SKEET,

        Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** before the Court on George Skeet's Motion to Dismiss, filed February 23, 2022.  Doc. 27.  The government responded on March 23, 2022 [Doc. 33], and Mr. Skeet replied on May 4, 2022 [Doc. 36].  The Court held a hearing on the motion on August 15, 2022.  Doc. 41.  Having carefully considered the briefs, relevant law, testimony, and evidence, and being otherwise fully informed, the Court finds that Mr. Skeet's Motion is well-taken and will be **GRANTED IN PART**.

## BACKGROUND

On April 23, 2021, Mr. Skeet was charged by a two-count Indictment.  Doc. 2.  In Count 1, Mr. Skeet was charged with selling and offering to sell red-tailed hawk feathers, in violation of the Migratory Bird Treaty Act ("MBTA").  *Id.* (citing 16 U.S.C. §§ 703 and 707(b)(2)).  In Count 2, Mr. Skeet was charged with selling and offering to sell golden eagle feathers and bald eagle feathers, in violation of the Bald and Golden Eagle Protection Act ("BGEPA") (a Class A Misdemeanor).  *Id.* (citing 16 U.S.C. § 668(a)).

Mr. Skeet is Diné (Navajo) and an enrolled member of the Navajo Nation, a federally recognized Indian tribe.  *See* Indian Entities Recognized by and Eligible to Receive Services from

the United States Bureau of Indian Affairs, 87 FR 4636, 4636-4641 (Jan. 28, 2022).  He allegedly sold and offered to sell feathers to Special Agent Adrienne Ruiz, an undercover officer posing as a member of the Pascua Yaqui Tribe, which is also a federally recognized Indian tribe.  *See id.*

On August 6, 2021, Mr. Skeet filed a Motion to Compel Discovery, asking the Court to order the government to disclose certain records in order to make a race-based selective enforcement claim.  Doc. 19.  The Court denied the Motion, finding that Mr. Skeet had failed to proffer sufficient evidence to establish discriminatory effect.  Doc. 26.

On February 23, 2022, Mr. Skeet filed the instant motion to dismiss, arguing that the charges "violate long-standing treaty rights and are an unlawful burden on his religious freedoms." Doc. 27 at 1.  First, Mr. Skeet moves to dismiss Count 1, arguing that he has a treaty right to sell migratory bird feathers obtained from land ceded by the Diné in the treaty of 1868.  *Id.* at 2. Second, Mr. Skeet moves to dismiss Counts 1 and 2, arguing that both the Migratory Bird Treaty Act and the Bald and Golden Eagle Protection Act impermissibly infringe on his free exercise of religion, in violation of the Religious Freedom Restoration Act.  *Id.* at 8.  The Court scheduled a hearing on the motion for August 15, 2022.  Doc. 41.

On August 9, 2022—six days before the motion hearing—the government lodged a seven-count Superseding Indictment.  Doc. 44.  In addition to the counts charged in the original Indictment, the Superseding Indictment charges Mr. Skeet with offering to sell red-tailed hawk feathers, crested caracara feathers, golden eagle feathers, bald eagle feathers, Harris's hawk feathers, and Cooper's hawk feathers on various dates between January and April 2019, in violation of the MBTA.  *Id.* (citing 16 U.S.C. §§ 703 and 707(b)(2)).

Prior to the hearing, the Court informed parties that it would limit the scope of the hearing to Mr. Skeet's first argument regarding treaty rights.  The Court informed parties that it would not

hear evidence on Mr. Skeet's second argument regarding religious freedom because, as a primarily factual rather than legal issue, the defense is "territory reserved to the jury as the ultimate finder of fact in our criminal justice system."  *United States v. Pope*, 613 F.3d 1255, 1259 (10th Cir. 2010).  The Court will address this finding further in the Religious Freedom section *infra*.

At the motion hearing, parties stipulated that every feather that Mr. Skeet was charged with selling or offering to sell in the Superseding Indictment originated from within the boundaries of the Naabeehó Bináhásdzo (the Navajo reservation).[1]  *See* Motion Hearing Transcript at 13:7–15; 15:1–6; 224:12–13 (available upon request).   Additionally, in light of the late filing of the Superseding Indictment, the Court asked parties whether they objected to the Court ruling on the additional counts charged under the MBTA in the Superseding Indictment on the basis of Mr. Skeet's treaty-rights argument.  Parties had no objection.  *Id.* at 225:3–14.  Accordingly, the Court will proceed to evaluate and rule upon all counts in the Superseding Indictment.  *See* Doc. 44.

## LEGAL STANDARD

Pursuant to Federal Rule of Criminal Procedure 12(b)(1), "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits."  Fed. R. Crim. P. 12(b)(1).  "So, for example, a court may always ask whether the allegations in the indictment, if true, are sufficient to establish a violation of the charged offence and dismiss the indictment if its allegations fail that standard," because the inquiry focuses on the legal rather than factual adequacy of the indictment.  *Pope*, 613 F.3d at 1260.  "[L]ikewise, courts may entertain motions that require it to answer only pure questions of law."  *Id.*  Finally, a court may entertain

---

[1] "The Navajo name for the reservation is Naabeehó Bináhásdzo.  Diné Bikéyah and Naabeehó Bikéyah is Diné/Navajo land, and Dinétah refers to the ancestral homeland, often the specific location whether the people emerged into this world."  Lloyd L. Lee, *Diné Identity in a Twenty-First-Century World* 76 (2020).  The Court uses the term "Naabeehó Bináhásdzo" to refer to the Navajo reservation as established by the Treaty with the Navajo Indians of 1868.

motions that require additional fact-finding, so long as such fact-finding is "entirely segregable from the evidence to be presented at trial." *Id.*

On the other hand, a defendant cannot litigate a motion that goes to the ultimate issue of guilt based on contested facts—except in rare circumstances. *Id.* at 1259. Generally, "[i]f contested facts surrounding the commission of the offense would be of *any* assistance in determining the validity of the motion, Rule 12 doesn't authorize its disposition before trial." *Id.* (emphasis in original). This is so because fact-finding that goes to a defendant's ultimate guilt "can risk trespassing on territory reserved to the jury as the ultimate finder of fact in our criminal justice system." *Id.* at 1259. Moreover, it

> [D]isserves judicial economy to hold a separate "mini-trial" on a defense only to repeat the exercise with largely the same evidence a short time later at the trial itself. A pretrial hearing in these circumstances may wind up being little more than a "dress rehearsal" that is not only needlessly repetitive but that might also facilitate an end-run around the limited discovery rules governing criminal prosecutions.

*Id.*

Finally, courts may determine motions to dismiss that rely on facts outside the indictment and bearing on the issue of guilt where (1) "the operative facts are undisputed," (2) "the government fails to object to the district court's consideration of those undisputed facts," and (3) "the district court can determine from them that, *as a matter of law,* the government is incapable of proving its case beyond a reasonable doubt." *Id.* at 1260 (quotation omitted). "[E]ven *latent* factual disputes over circumstances surrounding the commission of the alleged offense can sometimes prevent pretrial determination of a defense." *Id.* at 1261. As a practical result, dismissals on this basis are the "rare exception." *Id.* at 1260.

In sum, courts may decide a motion to dismiss if it "rest[s] on a pure question of law, the facts charged in the indictment itself, [] agreed extra-indictment facts," or facts that are "entirely

segregable from the evidence to be presented at trial." *Id.* at 1260–61.

## DISCUSSION

### I.    Diné Treaty Rights

#### a.    Parties' Arguments

Mr. Skeet moves to dismiss all alleged violations of the Migratory Bird Treaty Act ("MBTA").  Doc. 27; Mot. H'rg Tr. at 227:17–228:7.  He argues that, as an enrolled member of the Navajo Nation, he has a right to sell migratory bird feathers obtained from land ceded by the Diné in the treaty of 1868.  Doc. 27 at 2.  First, Mr. Skeet contends that his case presents legal issues akin to those decided in *United States v. Bresette*.  *Id.* (citing 761 F. Supp. 658 (D. Minn. 1991)).  Drawing on *Bresette*, Mr. Skeet argues that the Treaty with the Navajo Indians of 1868 preserved the usufructuary rights of the Navajo Nation—including the right to sell migratory bird feathers.  *Id.* at 2–6 (citing the Treaty with the Navajo Indians of 1868, June 1, 1868, 15 Stat. 667 [hereinafter "1868 Navajo Treaty"]).  Next, Mr. Skeet argues that these treaty rights were not abrogated by the MBTA.  *Id.* at 7–8.  Finally, he concludes that the MBTA does not involve a permissible, nondiscriminatory regulation of treaty rights.  *Id.* at 8.

The government responds, arguing that Mr. Skeet cannot assert "the Chippewa Indians of Lake Superior treaty rights discussed in *United States v. Bresette*."  Doc. 33 at 5.  The government then argues that although the 1868 Navajo Treaty creates a right to hunt, it does not create "a right to commercialization of wildlife obtained on Navajo land," unlike the "much broader" Chippewa treaties.  *Id.* at 7–8.  The government argues that "[t]here is no historical evidence of a Navajo practice of commercializing eagle or other bird parts," and that contemporary Navajo Nation laws and policies prohibit the commercialization of wildlife, including migratory birds such as eagles and hawks.  *Id.* at 8–10.  Thus, the government argues that Diné treaty rights do not extend to the sale of migratory bird parts and that the "Navajo's treaty rights are therefore subject to the MBTA's

prohibitions on commercial activities with respect to bird parts." *Id.* at 11.  Finally, the government argues that the MBTA is "nondiscriminatory, reasonable, and necessary."  *Id.*

Mr. Skeet replies, assuring that he is asserting Diné treaty rights, rather than Chippewa treaty rights.  Doc. 36 at 3.  He argues that the government "cites no authority or sources" for its contention that Chippewa treaty rights are broader than Diné treaty rights, and therefore concludes that the argument is "equally bold and without merit."  *Id.* at 4.  Next, Mr. Skeet contends that treaty rights "are to be interpreted as the *Indians* understood them."  *Id.* at 4 (quoting *Bresette*, 761 F. Supp. at 661 (emphasis in original)).  Accordingly, he argues that "[m]odern day Navajo law and policies do not satisfy this standard," and that the Court should interpret the treaty as it was understood by the Diné who entered into the treaty in 1868.  *Id.*

### b.  Scope of Diné Treaty Rights

The Court must first determine whether the 1868 Navajo Treaty preserved the usufructuary rights of the Navajo Nation, and if so, whether these rights extend to the commercialization of migratory bird feathers.  As explained *infra*, the Court concludes that the 1868 Navajo Treaty reserves a usufructuary right to sell migratory bird feathers obtained within the boundaries of the Naabeehó Bináhásdzo.

### i.  Usufructuary Rights

The concept of usufructuary rights dates back to Roman law and refers to the right "to use and enjoy the fruits of another's property," despite lacking any other interest in the land.  *See* USUFRUCT, Black's Law Dictionary (11th ed. 2019); USUFRUCTUARY, Black's Law Dictionary (11th ed. 2019).  For example, in the foundational case *Johnson v. M'Intosh*, the Supreme Court voided land transfers made by the Piankeshaw Nation by finding that "the North American Indians could have acquired no proprietary interest in the vast tracts of territory which

6

they wandered over," because they had "a mere right of usufruct and habitation, without power of alienation."  21 U.S. 543, 569–70 (1823).

In the context of treaties made with tribes, a usufructuary right is often defined as "the right to make a modest living by hunting and gathering off the land." *Bresette,* 761 F. Supp. at 660; *see also Mashpee Wampanoag Tribe v. Bernhardt*, 466 F. Supp. 3d 199, 234 (D.D.C. 2020), *appeal dismissed,* No. 20-5237, 2021 WL 1049822 (D.C. Cir. Feb. 19, 2021) (including fishing in the definition of usufructuary rights); *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 344 (7th Cir. 1983), *cert. denied*, 464 U.S. 805 (1983) (including trapping in the definition of usufructuary rights).  Most case law on tribes' usufructuary rights relates to their off-reservation rights.  *See, e.g.*, *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172 (1999) (determining that treaty-based, off-reservation usufructuary rights had not been extinguished or released).

Courts have generally found that the usufructuary rights established by *M'Intosh* have survived treaty-making processes.  For example, a circuit court interpreting the Treaty with the Osage determined that the treaty granted the Osages "a usufructuary right" in the land, even though the treaty makes no explicit mention of usufructuary rights, but only provides that "there shall be reserved [a specific tract of land], to, and for, the Great and Little Osage Tribes or Nations, aforesaid, so long as they may choose to occupy the same."  *United States v. Leavenworth, L. & G.R. Co.*, 26 F. Cas. 901, 904 (C.C.D. Kan. 1874), *aff'd*, 92 U.S. 733 (1875); Treaty with the Osage, 1825, art. 1–2, June 2, 1825, 7 Stat. 240.  Similarly, the Supreme Court has explained that "[a]s a general rule, Indians enjoy exclusive treaty rights to hunt and fish on lands reserved to them, unless such rights were clearly relinquished by treaty or have been modified by Congress. These rights need not be expressly mentioned in the treaty."  *United States v. Dion*, 476 U.S. 734,

738 (1986). Indeed, even where no treaty exists, courts have found that "Indian reservations created by statute, agreement, or executive order normally carry with them the same implicit hunting rights as those created by treaty." *United States v. Turtle*, 365 F. Supp. 3d 1242, 1245 (M.D. Fla. 2019) (quoting *Dion*, 476 U.S. at 745 n.8). Finally, even where a treaty explicitly preserves usufructuary rights but conditions them on "the pleasure of the President of the United States" or makes them subject to future revocation by the President or Congress, the Supreme Court has been unwilling to terminate such rights. *Mille Lacs Band of Chippewa Indians*, 526 U.S. at 207.

Here, the 1868 Navajo Treaty undoubtedly preserves the usufructuary rights of the Navajo Nation. First, because the treaty does not clearly relinquish their on-reservation usufructuary rights, such rights are preserved for the Navajo Nation's exclusive use. *See Dion*, 476 U.S. at 745 n.8; *Leavenworth, L. & G.R. Co.*, 26 F. Cas. at 904; *see also United States v. Fox*, 573 F.3d 1050, 1053 (10th Cir. 2009) (finding that "the Treaty of 1868 preserved for the Navajo Nation the right to hunt on reservation lands"). Moreover, the treaty expressly preserves their off-reservation usufructuary rights by providing that the Navajo Nation will "retain the right to hunt on any unoccupied lands contiguous to their reservation, so long as the large game may range thereon in such numbers as to justify the chase." 1868 Navajo Treaty at art. IX.

### ii. *Commercial* Usufructuary Rights

The government argues that the 1868 Navajo Treaty "makes no mention of commercial use of wildlife hunted on reservation land." Doc. 33 at 8. In support of this proposition, the government cites an Intergovernmental Compact between the Hopi and the Navajo Nation preventing the commercialization of bird parts that was entered into on November 3, 2006. *Id.* at 8–9 (citing *The Hopi Tribe v. The Navajo Nation*, Complaint, 2013 WL 3779783 (D. Ariz. July 5,

2013)).   The government also cites several current Navajo Nation laws prohibiting the commercialization of game that appear to date back to 1977.  *Id.* at 9–10 (citing 17 NAVAJO CODE § 502 (enacted in 1977); § 505(b) (same); § 506(C) (same); § 507(c) (same)).  Additionally, the government offers evidence of current regulations and policies related to the permitting process to obtain eagle feathers—a process that appears to date back to 1974.  *Id.* at 10 (citing 50 C.F.R § 22.22 (enacted in 1974)); Government's Exhibit 10 (Resolution of the Resources Committee of the Navajo Nation Council, Approving the Navajo Nation Golden and Bald Eagle Nest Protection Regulations, dated Sept. 10, 2008).  Finally, the government offers evidence of modern Navajo Nation policies prohibiting the commercialization of migratory birds.  *See, e.g.*, Doc. 33-3 (Navajo Endangered Species List, dated Feb. 13, 2020); Doc. 33-4 (Navajo Nation Eagle Feather Distribution Policy, dated Dec. 1, 2016); Doc. 33-5 (Navajo Nation Eagle Feather Application, circa Dec. 2016).

While highly indicative of modern Diné attitudes on conservation, this proffered evidence is irrelevant to the interpretation of the 1868 Navajo Treaty.  "When analyzing the meaning of a treaty's language, courts look beyond the written words to the larger context that frames the treaty, including the history of the treaty, the negotiations, and the practical construction adopted by the parties."  *Cherokee Nation v. Bernhardt*, 936 F.3d 1142, 1158 (10th Cir. 2019) (quotations omitted) (citing *Mille Lacs Band of Chippewa Indians*, 526 U.S. at 196).  Moreover, "because we interpret Indian treaties to give effect to the terms as the Indians themselves would have understood them," courts often examine the historical record to gain "insight into how the parties to the Treaty understood the terms of the agreement."  *Mille Lacs Band of Chippewa Indians*, 526 U.S. at 196; *see also United States v. Smiskin*, 487 F.3d 1260, 1264 (9th Cir. 2007) ("The text of a treaty must be construed as the Indians would naturally have understood it *at the time of the treaty*, with

doubtful or ambiguous expressions resolved in the Indians' favor.") (emphasis added). Because the government's evidence appears to date back to no later than 1974, the Court finds that it has no relation to "how the parties to the Treaty understood the terms of the agreement" signed in 1868. *Mille Lacs Band of Chippewa Indians*, 526 U.S. at 196.

On the other hand, the larger context that frames the treaty, including the history of the treaty, the treaty negotiations, and the customary Diné practices at the time, demonstrate that Diné people's usufructuary rights include a right to commercialize the fruits of the land. As to the history of the treaty, as Mr. Skeet contends, the 1868 Navajo Treaty was signed in the wake of the U.S. government forcibly displacing thousands of Diné and confining them to Fort Sumner, New Mexico, in conditions of abject poverty. Doc. 27 at 4–5 (citing Peter Iverson, *Diné: A History of the Navajos*, 36, 51–52, 59 (2002), and Robert A. Trennert, *White Man's Medicine: Government Doctor's Among the Navajo*, 1863–1955 (1998)). Because most of the land at Fort Sumner was not arable, the Diné could not attain self-sufficiency and were instead forced to rely on the U.S. government. As General William Sherman—the primary U.S. negotiator of the treaty—wrote: "[T]hey have cost the government, for subsistence alone, a half-million dollars per year." *See* Letter from W. T. Sherman to E. D. Townsend, June 24, 1868, at 1 [hereinafter "Sherman Letter"] https://archive-bosqueredondomemorial.nmhistoricsites.org/item/10228 (last visited Aug. 26, 2022), *attached as* Exhibit 1 at 6. Accordingly, General Sherman explained that "[t]o continue this state of affairs would have been absurd, and, as all the Indians asked was permission to return to their native land, . . . the [treaty] was considered an act of wise policy." Sherman Letter at 1; Ex. 1 at 6. Based on this historical record, the Court finds that the 1868 Navajo Treaty was designed primarily to reduce the Diné's dependence on, and thus expense to, the United States government—not to terminate their usufructuary rights. Indeed, to prohibit the Diné from

commercializing the fruits of the land would be precisely counter to the federal government's intent that the Diné reestablish self-sufficiency.

The treaty negotiations also demonstrate that the Diné understood the 1868 Navajo Treaty to grant them the right to commercialize the fruits of the land.  Indeed, the primary Diné negotiator, Chief Barboncito, discussed trade with General Sherman multiple times over the course of the three-day negotiations.  For example, on May 28, 1868, General Sherman expressed his openness to negotiate for the Diné's return to their homeland, stating "if we agree, we will make a boundary line outside of which you must not go *except for the purpose of trading*."  Proceedings of a Council with the Navajo Indians, May 28, 1868, at 9 [hereinafter "May 28, 1868 Proceedings"] (emphasis added) https://archive-bosqueredondomemorial.nmhistoricsites.org/item/12691 (last visited Aug. 26, 2022); *see also* Treaty Between the United States of America and the Navajo Tribe of Indians With a Record of the Discussion that Led to Its Signing (1968) [hereinafter "Treaty Records"], *attached as* Exhibit 2 at 5.  Later in the same discussion, General Sherman again assured Chief Barboncito that the Diné could "come to the Mexican towns to trade."  May 28, 1868 Proceedings at 9; Treaty Records at 5.  The next day, Chief Barboncito pushed General Sherman on the issue of usufructuary rights, and the following exchange occurred:

| | |
|---|---|
| *Chief Barboncito:* | You spoke to me yesterday about putting us on a reservation with a boundary line, I do not think it right to confine us to a certain part, we want to have the privilege of going outside the line to hunt and trade. |
| *General Sherman:* | You can go outside the line to hunt, you can go to Mexican towns to trade, but your farms and houses must be inside the boundary line, beyond which you have no claim to the land. |
| *Chief Barboncito*: | That is the way I like to be and return to the Commissioners my best thanks.  After we get back to our country it will brighten up again, and the Navajos will be as happy as the land[.] |

Proceedings of a Council with the Navajo Indians, May 29, 1868, at 5–6 [hereinafter "May 29, 1868 Proceedings"] https://archive-bosqueredondomemorial.nmhistoricsites.org/item/12703 (last visited Aug. 26, 2022); *see also* Treaty Records at 8.  After the parties reached an agreement as to the exact boundary of the Naabeehó Bináhásdzo, another Diné negotiator, Ganado Mucho, demonstrated his own understanding of the treaty, stating: "After we go back to our own country it will be the same as it used to be . . . We understand the good news you have told us to be right and like it very much."  Proceedings of a Council with the Navajo Indians, May 30, 1868, at 2–3 [hereinafter "May 30, 1868 Proceedings"] https://archive-bosqueredondomemorial. nmhistoricsites.org/item/12718 (last visited Aug. 26, 2022); *see also* Treaty Records at 10.  These statements indicate that the Diné treaty signatories had no expectation of land-use restrictions; instead, they explicitly understood the treaty to grant them the right to sell the fruits of their land off the reservation.

Finally, the customary practices of the Diné at the time of the treaty's signing demonstrate that their usufructuary rights extend to commercial activity.  Historical evidence shows that the Diné had a rich history of trading "with the Pueblos, Utes, Comanches, the Mescalero, Chiricahua, San Carlos, Jicarilla and White Mountain Apaches, the Hualapais, Yavapais, and Havasupais, Spanish Americans, and later on, the Anglo-Americans."  Willow Roberts Powers, *Navajo Trading: End of an Era*, 25 (2001); Doc. 27 at 5.  Common trade commodities included "livestock, deer hides, baskets, [] weavings[,] corn, meat, pottery, jewelry, and metal."  *Id.*  As "participants in an international market economy," trading in goods derived from their land, there is "ample evidence that the [Diné] understood that their hunting and gathering rights . . . encompassed the sale of their catch."  *Bresette*, 761 F. Supp. at 662.

Accordingly, the Court finds that the 1868 Navajo Treaty guarantees the right to

commercialize the fruits of the land reserved to the Diné.  Moreover, given the historical record, the Court notes that this right to commercialization extends to off-reservation commerce.  That is, the 1868 Navajo Treaty in no way limits the Diné from selling the fruits of their land to non-Diné or non-Native people.

### iii.   Commercial Usufructuary Rights *as to Migratory Birds*

Mr. Skeet argues that the Diné's commercial usufructuary rights extend to migratory birds. Doc. 27 at 6–7; Doc. 36 at 6–8.  There are several reasons to credit this argument.  First, the Court does not read the 1868 Navajo Treaty's silence on migratory birds to mean that the Diné were proscribed from commercializing them.  In fact, the treaty is silent on trade goods altogether,[2] even though trade was explicitly mentioned in treaty negotiations.  *See, e.g.*, May 30, 1868 Proceedings at 2–3; May 29, 1868 Proceedings at 5–6; *see also* Treaty Records at 8, 10.  Moreover, treaty negotiators were aware that the Diné had a complex economy involving farming, herding, hunting, metalworking, construction, and skilled arts and crafts when they entered into the 1868 Navajo Treaty.  *See, e.g.*, Letter from Theo. H. Dodd to W. T. Sherman and S. F. Tappan, May 30, 1868, at   5,   10   [hereinafter   "Dodd   Letter"]   https://archive-bosqueredondomemorial. nmhistoricsites.org/item/10237 (last visited Aug. 26, 2022) ("They are acquainted with the principles of irrigation and are quite skillful in making acequias, adobes, blankets, bridles, bits, baskets, [saddles] and many other articles."); May 29, 1868 Proceedings at 2 (discussing "these beads which we wear on our necks" that "have been handed down from generation to generation");

---

[2] The 1868 Navajo Treaty mentions one possible trade good—"large game."  *See* 1868 Navajo Treaty at art. IX.  Yet this mention of "large game" is in the context of defining the Navajo Nation's usufructuary right to hunt outside of the reservation.  *Id.* (providing that the Navajo Nation will "retain the right to hunt on any unoccupied lands contiguous to their reservation, so long as the large game may range thereon in such numbers as to justify the chase").  Thus, it cannot properly be interpreted as an enumeration of trade goods.

*id.* at 5–6 (discussing trade with the "Mexican" towns); *id.* at 8 ("We would like to have a blacksmith shop as a great number of us can work at the trade, we would like a carpenters shop . . ."); May 28, 1868 Proceedings (discussing the Diné's history of farming, hunting, and herding generally); *see also* Treaty Records at 4, 7–8, 11–13.   Thus, the Court concludes that treaty negotiators felt no need to enumerate the trade goods covered by the 1868 Navajo Treaty.   Had the treaty negotiators felt the need to restrict the Diné's usufructuary rights in any way, they could have included a specific exception—as they did by providing that the Diné's right to off-reservation hunting would endure only "so long as the large game may range thereon in such numbers as to justify the chase."   1868 Navajo Treaty at art. IX.   The Court therefore reads the 1868 Navajo Treaty's silence on trade goods to mean that Diné people's usufructuary rights extend to the commercialization of *any* fruit of the land—including migratory birds.   *See, e.g.*, *United States v. Fiddler*, No. 2:10-CR-00052-RLH, 2011 WL 2149510, at *4 (D. Nev. Mar. 11, 2011), *report and recommendation adopted,* No. 2:10-CR-00052-RLH, 2011 WL 2148853 (D. Nev. June 1, 2011) (finding that historical evidence that the Sioux traded in animal furs and hides established a broad commercial usufructuary right that extended to the sale of migratory bird feathers).

Other courts have found that there is no commercial usufructuary right as to migratory birds where, for example, "it would be contrary to the expectations of the [treaty signatories] to interpret the 'right to hunt' reserved by the treaty to include the right to sell eagles commercially," given historical evidence "that the eagle had a special religious significance and that as a result the Indians did not deal commercially in eagles or eagle parts."   *United States v. Top Sky*, 547 F.2d 486, 487–88 (9th Cir. 1976) (interpreting the treaty rights of the Shoshone and Bannock Indians); *see also, e.g.*, *United States v. Vance Crooked Arm*, No. CR-13-18-BLG-RFC, 2013 WL 1869113, at *3 (D. Mont. May 3, 2013) (finding no usufructuary right, in part, because "killing and

commercializing eagles and hawks is actually inimical and offensive to Crow religion and culture"); *United States v. Dion*, 752 F.2d 1261, 1264 (8th Cir. 1985) (finding no usufructuary right because the record revealed "that the sale of eagle parts is deplored as a matter of tribal custom and religion" by the Yankton Sioux).

Here, however, there is no evidence before the Court that it would have been anathema to the Diné to sell migratory bird feathers at the time of the treaty's signing in 1868.[3]  To the contrary, there is evidence that the Diné engaged in the trade of feathers at the time of the treaty's signing in 1868.  Navajo Cultural Specialist Timothy Begay, of the Navajo Nation Heritage and Historic Preservation Department, testified that the Diné traded eagle feathers for commodities like baskets, blankets, jewelry, and precious stones at the time of the treaty's signing.  Mot. Hr'g Tr. at 78:18–20, 91:25–92:16.   There is also evidence that religious goods and services were subject to commercialization at the time of the treaty's signing, a practice that necessarily implicated the commercialization of religiously significant bird feathers.  *See* Doc. 27 at 6 (citing Roberts Powers, *Navajo Trading* at 25; Iverson, *Diné* at 101; Charlotte J. Frisbie, *Navajo Medicine Bundles or Jish: Acquisition, Transmission, and Disposition in the Past and Present* 72 (1987)).   This history of feather commercialization is strong evidence that the Diné's commercial usufructuary rights extend to migratory birds.  *See, e.g.*, *Turtle*, 365 F. Supp. 3d at 1247 (finding a usufructuary right to sell alligator eggs based, in part, on historical evidence of alligator egg sales at the time the Seminole Tribe was federally recognized); *Vance Crooked Arm*, 2013 WL 1869113, at *2–*3 (finding no usufructuary right to sell bird feathers based, in part, on the lack of historical evidence

---

[3] Admittedly, the government produced substantial evidence that it would be anathema to members of the Navajo Nation to sell migratory bird feathers *today*.  *See, e.g.*, Mot. Hr'g Tr. at 133:19–134:3; Gov. Ex. 10, 11, 15.  However, as discussed *supra*, treaties must be interpreted "to give effect to the terms as the Indians themselves would have understood them" at the time of the treaty's signing.  *Mille Lacs Band of Chippewa Indians*, 526 U.S. at 196.

of bird feather sales at the time the Crow treaties were executed); *Bresette,* 761 F. Supp. at 662 (finding a usufructuary right to sell bird feathers based, in part, on historical evidence of bird feather sales around the time the Chippewa treaties were executed).  Accordingly, the Court finds that the 1868 Navajo Treaty guarantees the right to commercialize migratory birds and bird parts.

### iv.   *Mr. Skeet's* Commercial Usufructuary Rights as to Migratory Birds

Mr. Skeet may assert his treaty right to commercialize migratory bird feathers as a defense to the criminal charges he faces in the instant case.  *See, e.g.*, *Fox*, 573 F.3d at 1054 ("[I]ndividual Navajos may assert their treaty-guaranteed hunting rights as a general matter").  However, because this treaty right only pertains to the fruits of the land reserved to the Diné in the 1868 Navajo Treaty, Mr. Skeet may only successfully assert his treaty right if the feathers at issue in the instant case originate from the Naabeehó Bináhásdzo or its contiguous, unoccupied lands.  *See* 1868 Navajo Treaty at art. IX (reserving usufructuary hunting rights "on any unoccupied lands contiguous to their reservation").  As discussed *supra*, the Superseding Indictment charges Mr. Skeet with selling and offering to sell red-tailed hawk feathers, golden eagle feathers, and bald eagle feathers, and offering to sell (but not actually selling) red-tailed hawk feathers, crested caracara feathers, golden eagle feathers, bald eagle feathers, Harris's hawk feathers, and Cooper's hawk feathers.  Doc. 44.

During the motion hearing, Mr. Skeet stipulated that all of the feathers alleged in the Superseding Indictment came from within the boundaries of the Naabeehó Bináhásdzo.  Mot. Hr'g Tr. at 13:7–15.  The government agreed to this stipulation, concurring that the feathers came from the Naabeehó Bináhásdzo.  *Id.* at 14:25–15:6.  Later in the hearing, Navajo Nation Zoologist David Mikesic testified that the crested caracara and the Harris's hawk are not native to the Navajo Nation, but that all other birds mentioned in the Superseding Indictment are native to the Navajo

Nation. *Id.* at 161:12–163:8. In response to this testimony, defense counsel argued persuasively that "not native [to]" and "not found on" the Navajo Nation are entirely different matters. *Id.* at 226:14–22. Indeed, the phenomenon of birds appearing outside of their normal habitats is so well-known that it has a term: vagrancy.[4] The government offered no additional evidence regarding the origin of the feathers. Moreover, the government's case agent, Special Agent Adrienne Ruiz, testified that she made no effort to investigate the origin of the feathers. *Id.* at 24:19–22; 25:1–3. The Court then specifically questioned the government to confirm that it stipulated that the feathers came from within the boundaries of the Naabeehó Bináhásdzo, notwithstanding Mr. Mikesic's testimony. *Id.* at 226:23–227:2. The government again affirmed that it agreed that the feathers came from the Naabeehó Bináhásdzo. *Id.* at 227:3–12. Accordingly, the Court credits parties' stipulation that the feathers came from within the boundaries of the Naabeehó Bináhásdzo and finds that the government has forfeited any argument to the contrary.

Because the feathers at issue in the instant case are the fruit of the Naabeehó Bináhásdzo, the Court concludes that Mr. Skeet can assert his treaty right to commercialize migratory bird feathers as an affirmative defense.

### v. *Burden to Prove* Mr. Skeet's Commercial Usufructuary Rights as to Migratory Birds

At the motion hearing, the government asked the Court to determine which party carried the burden of proof to establish whether Mr. Skeet has a treaty right to sell migratory bird feathers. Mot. Hr'g Tr. at 102:21–103:4. Parties did not brief the issue and the Court has been unable to

---

[4] In fact, there is some indication that climate change affects species' normal ranges and may make vagrancy itself more common and extreme. *See, e.g.*, Alexander Lees et al., *Vagrancy in Birds* (2022); Lesley Evans Ogden, *Vagrant Birds May Portend Species Distribution in Climate-Changed World*, Scientific American (Aug. 19, 2016).

identify any controlling case law on this question.  Courts that have considered whether other treaties have granted a usufructuary right to sell migratory bird feathers have not addressed which party bears the burden of proof.  Some courts appear to assume, without deciding, that defendants bear an initial burden to establish that migratory bird feathers were sold at the time of the relevant treaty's signing.  *See, e.g.*, *Vance Crooked Arm*, 2013 WL 1869113, at *3 (finding no usufructuary right to sell eagle and hawk feathers, in part because the "Defendant present[ed] no such historical evidence [of commercialization] as of the time the Crow treaties were executed"); *Bresette*, 761 F. Supp. at 662 (finding a usufructuary right to sell migratory bird feathers, in part based on defendant's proffered evidence regarding the trading or selling of bird feathers around the time of the treaty's signing) (citing New York Historical Society, *American Fur Company Papers*, Letter 5508, reel 27 (letter of Charles Borup to William Davenport dated January 23, 1839)).  Other courts appear to fill in evidentiary gaps by taking judicial notice of the historical record.  *See, e.g.*, *Turtle*, 365 F. Supp. 3d at 1246–47 (finding a usufructuary right to sell alligator eggs, despite the fact that Mr. Turtle's "Memorandum of Law [was] silent on a traditional right to sell wildlife," by judicially noticing historical evidence that "in the early 20th Century, alligator hides and eggs were important trade goods for tribal members who bartered with white settlers") (citing Harry A. Kersey Jr., *Pelts, Plumes, and Hides: White Traders Among the Seminole Indians, 1890–1930*, 51 Fla. Hist. Q. 250, 254 (1973)).  Still other courts make no mention of whether they took judicial notice of the historical record or relied on evidence proffered by the defendant.  *See, e.g.*, *Fiddler*, 2011 WL 2149510, at *4 (finding a usufructuary right to sell migratory bird feathers based on two books detailing the Sioux's historical reliance on trading and bartering) (citing Edward Lazarus, *Black Hills White Justice, The Sioux Nation Versus the United States 1775 to Present* 51–52 (1991) and Guy Gibbon, *The Sioux: The Dakota and Lakota Nations* 49 (2003)).

The Court declines to articulate an exact standard for determining the burden of proof to establish a treaty right when a criminal defendant asserts this as an affirmative defense. To the extent that Mr. Skeet has a burden to establish a treaty right to sell migratory bird feathers, the Court finds that he has met it here. In his briefing, Mr. Skeet referenced several texts indicating that religious goods and services—a category into which feathers fall—were subject to commercialization at the time of the treaty's signing. *See* Doc. 27 at 6 (citing Roberts Powers, *Navajo Trading* at 25; Iverson, *Diné* at 101; Frisbie, *Navajo Medicine Bundles or Jish* at 72). Though the government encouraged the Court to disregard this so-called "anthropological literature," the case law discussed *supra* indicates that courts frequently turn to precisely this type of evidence to evaluate the existence of treaty rights. Doc. 33 at 15; *see also Bresette*, 761 F. Supp. at 662 (citing New York Historical Society, *American Fur Company Papers*, Letter 5508, reel 27); *Turtle*, 365 F. Supp. 3d at 1246–47 (citing Kersey Jr., *Pelts, Plumes, and Hides* at 254); *Fiddler*, 2011 WL 2149510, at *4 (citing Lazarus, *Black Hills White Justice* at 51–52 and Gibbon, *The Sioux* at 49). Additionally, at the motion hearing, defense counsel elicited testimony indicating that the Diné bartered eagle feathers for commodities like baskets, blankets, jewelry, and precious stones "because there was no currency" at the time of the treaty's signing. *See* Mot. Hr'g Tr. at 78:18–20, 91:25–92:16; BARTER, Black's Law Dictionary (11th ed. 2019) (defining "barter" as "[t]he exchange of one commodity or service for another without the use of money"). Not only is bartering akin to making a sale, but it is also a practice proscribed by the Migratory Bird Treaty Act. *See* 16 U.S.C. § 703(a) (prohibiting anyone from bartering or offering to barter migratory birds or bird parts). Finally, it is uncontested that Mr. Skeet is an enrolled member of the Navajo Nation, a federally recognized Indian tribe, and is therefore entitled to assert rights reserved by the 1868 Navajo Treaty. *See* Mot. Hr'g Tr. at 103:14–17; *Fox*, 573 F.3d at 1053. This is far more

evidence than some courts have required to find a usufructuary right to sell migratory bird feathers, and is satisfactory, alone, to establish Mr. Skeet's treaty right to sell migratory bird feathers. *See, e.g.*, *Turtle*, 365 F. Supp. 3d at 1246–47.

The Court also takes judicial notice of historical records documenting the history of the 1868 Navajo Treaty and the negotiations that preceded its signing. *See* Dodd Letter; Sherman Letter; May 30, 1868 Proceedings; May 29, 1868 Proceedings; May 28, 1868 Proceedings; Treaty Records. This accords with other courts that have taken judicial notice of the historical record in order to interpret treaties. *See, e.g.*, *Turtle*, 365 F. Supp. 3d at 1246–47. It also accords with the Court's duty to interpret treaties "to give effect to the terms as the Indians themselves would have understood them" at the time of the treaty's signing. *Mille Lacs Band of Chippewa Indians*, 526 U.S. at 196. Moreover, it may be unnecessary to even judicially notice such records given that the treaty negotiations are directly analogous to the type of legislative history that any court might properly consider when interpreting a statute or regulation. Regardless, indisputable evidence from the historical record lends further credence to the existence of the treaty right Mr. Skeet asserts.

Having found that Mr. Skeet has met his evidentiary burden—to the extent that he has one—the Court finds that the burden of proof shifts back to the government to disprove the existence of a treaty right to sell migratory bird feathers. Having offered no evidence that the sale of migratory birds was anathema to the Diné around the time of the 1868 Navajo Treaty's signing, the government has not met its burden to disprove the existence of this right. Accordingly, the Court will proceed in its analysis of whether the treaty right was abrogated or otherwise permissibly regulated by the MBTA.

### c. Abrogation of Treaty Rights

The Migratory Bird Treaty Act did not abrogate the Diné's treaty-based usufructuary right to commercialize migratory birds and bird parts.  To abrogate a treaty right, Congress must demonstrate a "clear and plain intent" to do so.  *Dion*, 476 U.S. at 739.  Although the Supreme Court has not outlined a definite standard for "clear and plain intent," it has stated that a finding of abrogation requires "clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty." *Id.* at 740.

In *Dion*, the Supreme Court found that Congress "believed that it was abrogating the [treaty] rights of Indians to take eagles," when it amended what is now the Bald and Golden Eagle Protection Act to cover both golden and bald eagles.[5] *Id.* at 743.  This finding was based on the extensive legislative history discussing the use of eagle feathers in Native religious ceremonies. *Id.*   It was also based on the language of the BGEPA, which carved out a narrow religious exemption by putting "in place a regime in which the Secretary of the Interior had control over Indian hunting, rather than one in which Indian on-reservation hunting was unrestricted." *Id.*

In contrast, neither the MBTA's legislative history nor its plain language balance "the special cultural and religious interests of Indians" against "the conservation purposes of the statute." *Id.* at 743.  As the *Bresette* court explains, the MBTA's legislative history reveals that Congress *never* specifically considered Native treaty rights. *Bresette*, 761 F. Supp. at 663.  As for the statute itself, there is no exemption for the religious purposes of Native people, even though

---

[5] The Bald and Golden Eagle Protection Act was enacted in 1940 to protect bald eagles. *Dion*, 476 U.S. at 740; *see also* 16 U.S.C. § 668(a).  In 1962, it was amended to extend protections to the golden eagle. *Dion*, 476 U.S. at 741.  At the same time, Congress amended the BGEPA to carve out an exemption for the religious purposes of Native people. *Id.*; *see also* 16 U.S.C. § 668a.

subsequent regulations carve out a permitting system for scientific or educational purposes.  *See* 16 U.S.C. § 703(a); 50 C.F.R. § 21.73.

Given the plain language and legislative history of the MBTA, the Court finds that the MBTA did not abrogate Mr. Skeet's treaty right to possess or sell migratory bird parts.  *See Bresette*, 761 F. Supp. at 664; *see also* U.S. Dep't of Interior, Opinion M-37063 on Withdrawal of Solicitor Opinion M-36936, Solicitor Opinion M-36926, and Solicitor Opinion M-27690, at 2 (Jan. 15, 2021) [hereinafter "DOI Memorandum"] ("I am of the opinion that neither the ESA nor the MBTA possess the requisite plain language or legislative history demonstrating congressional intent to abrogate reserved hunting and fishing rights."); *United States v. Aguilar*, No. 10-CR-03101 MCA, 2011 WL 13284613, at *4 (D.N.M. Nov. 7, 2011), *aff'd*, 527 F. App'x 808 (10th Cir. 2013) (ordering the government to show cause for why its indictment "should not be dismissed" given that "there are serious questions as to whether Congress, in enacting the MBTA clearly abrogated Indian treaty rights to hunt on tribal lands, and whether a tribe member may be prosecuted under the MBTA for exercising treaty rights on tribal lands").

### d.  Permissible, Nondiscriminatory Regulation of Treaty Rights

The government argues that the MBTA's prohibitions "are nondiscriminatory, reasonable, and necessary conservation measures to which Indian treaty rights are subject."  Doc. 33 at 11. The government relies on a U.S. Department of the Interior Memorandum to argue that "it is settled law that each of the States has the ability to regulate reserved hunting and fishing, consistent with the Supreme Court's 'conservation necessity test.'"  *Id.* (citing DOI Memorandum at 2–3).  The DOI Memorandum relies, in turn, on the Supreme Court's *Puyallup* cases.  DOI Memorandum at 3 (citing *Puyallup Tribe v. Dep't of Game of Wash.*, 433 U.S. 165 (1977) (*Puyallup III*); *Dep't of Game of Wash. v. Puyallup Tribe*, 414 U.S. 44 (1973) (*Puyallup II*); *Puyallup Tribe v. Dep't of*

*Game of Wash.*, 391 U.S. 392 (1968) (*Puyallup I*) (collectively "*Puyallup*")).

The government's argument fails because *Puyallup* is inapplicable. First and foremost, *Puyallup* concerns the "appropriate exercise of the police power of the State," rather than the federal government's plenary power over "Indian affairs." *Puyallup I*, 391 U.S. at 398; *Delaware Tribal Bus. Comm. v. Weeks*, 430 U.S. 73, 84 (1977) ("The power of Congress over Indian affairs may be of a plenary nature; but it is not absolute."). Given that Congress did not exercise this power by abrogating the 1868 Navajo Treaty, as discussed *supra*, *Puyallup* is inapposite.

To the extent that the government argues that *Puyallup* is nevertheless instructive, the Court finds this unavailing. In *Puyallup*, the Supreme Court determined that Natives' treaty-based usufructuary rights are "subject to reasonable regulation by the State pursuant to its power to conserve an important natural resource." *Puyallup III*, 433 U.S. at 175. Critically, the Supreme Court was careful to explain that the Puyallup and Nisqually Tribes' usufructuary right to fish could be regulated—but not abrogated—by the State. *Id.*; *Puyallup I*, 391 U.S. at 398. "In other words, the 'right' to fish . . . was a treaty 'right' that could not be qualified or conditioned by the State." *Puyallup I*, 391 U.S. at 399. "But the manner of fishing, the size of the take, the restriction of commercial fishing, and the like . . . not being defined or established by the treaty, were within the reach of state power." *Id.* at 398–99.

Unlike in *Puyallup*, the policy at issue here abrogates, rather than regulates, the Diné's usufructuary rights as to migratory birds. Namely, the MBTA makes it unlawful to:

> pursue, hunt, take, capture, kill, attempt to take, capture, or kill, possess, offer for sale, sell, offer to barter, barter, offer to purchase, purchase, deliver for shipment, ship, export, import, cause to be shipped, exported, or imported, deliver for transportation, transport or cause to be transported, carry or cause to be carried, or receive for shipment, transportation, carriage, or export [any migratory bird or bird part subject to the MBTA without a permit.]

16 U.S.C. § 703(a). The regulations further specify that there is no right to pursue, hunt, capture,

kill, or attempt to do the same as to religiously significant birds like hawks or eagles. *See* 50 C.F.R § 20.11(a). The regulations also provide that even if a person has a falconry permit to take, possess, or transport hawks or eagles for the pursuit of wild game, it is expressly forbidden to "buy, sell, or barter" feathers—even when they are only molted or taken from deceased birds. 50 C.F.R. §§ 21.82(f)(12)(i), 21.82(f)(13)(v). In short, the MBTA wholly abrogates the exercise of the Diné's usufructuary rights as to migratory birds, rather than regulating the manner in which Diné people exercise their rights. *See Puyallup I*, 391 U.S. at 398–99. As such, the MBTA is properly analyzed under *Dion*, which relates to the abrogation of treaty rights, as discussed *supra*, rather than under *Puyallup*, which relates only to the "reasonable regulation" of treaty rights. *Puyallup III*, 433 U.S. at 175. As discussed *supra*, under *Dion*, the MBTA did not abrogate Mr. Skeet's treaty right to sell migratory bird feathers.

Finally, even if *Puyallup* applied, the Court cannot find that the MBTA's prohibitions are nondiscriminatory. The regulations include numerous carve outs, for example, to hunt non-religiously significant birds, 50 C.F.R. § 20.11(a), to kill birds to protect livestock, 50 C.F.R. § 21.100, to kill birds to protect airports and airfields, 50 C.F.R. § 21.2159, and to allow for the commercial use of feathers to make products like "fishing flies, bed pillows, and mattresses." 50 C.F.R. § 20.91. Yet, despite multiple efforts to amend the MBTA to allow for the religious use of feathers by Native Americans, the MBTA provides no legal protection for the Diné to exercise their usufructuary rights as to migratory birds.[6] *See, e.g.*, Bald and Golden Eagle Protection Act

---

[6] To the extent that the government argues that the Court should rely on the government's policy of enforcing only certain prohibitions under the MBTA, the Court finds this argument unavailing. Admittedly, the Department of Interior and Department of Justice have both issued policy statements committing to exercising their prosecutorial discretion to create a religious exemption for Native people to "possess, carry, use, wear, give, loan, or exchange among other Indians, without compensation, all federally protected birds, as well as their parts and feathers." Dep't of Interior, Office of Sec., Morton Issues Policy Statement of Indian Use of Bird Feathers (Feb. 5,

and Migratory Bird Treaty Act; Religious Use of Feathers, 84 Fed. Reg. 18230 (proposed Apr. 30,

2019) (to be codified at 50 C.F.R. § undefined); Migratory Bird Permits; Religious or Spiritual

Use of Feathers by Native Americans, 72 Fed. Reg. 33188 (proposed June 15, 2007) (to be codified

at 50 C.F.R. § 21).  As such, the MBTA effectively bars the Diné from exercising their usufructuary

rights, while authorizing others to hunt, kill, and commercialize migratory birds in a variety of

circumstances.  Because this situation is remarkably akin to *Puyallup*, in which the Supreme Court

found a policy barring Indian net fishing but allowing for hook-and-line fishing by sports

fisherman to be discriminatory, the Court finds the MBTA to be discriminatory.  *Puyallup II*, 414

U.S. at 48; *see also Bresette*, 761 F. Supp. at 664 ("The government cannot reasonably contend

that the statute's absolute proscription of the sale of bird feathers in this manner is a non-

discriminatory conservation measure intended to prevent the extinction of migratory birds.").

　　　　Accordingly, the Court finds that the MBTA does not regulate the Diné's treaty-based

usufructuary rights in a permissible, non-discriminatory manner.

### e.  Conclusion

　　　　The Court outlines its essential findings here.  First, the Court finds that it has the authority

to rule on Mr. Skeet's treaty-rights argument because its ruling rests exclusively on "agreed extra-

indictment facts" and facts that are "entirely segregable from the evidence to be presented at trial."

*Pope*, 613 F.3d at 1260–61.  Namely, the motion rests on facts related to how the Navajo Nation

would have understood the 1868 Navajo Treaty at the time of its signing—an issue entirely

---

1975) [hereinafter "Morton Policy"]; *see also* Dep't of Justice, Office of Att'y Gen., Memorandum
on Possession or Use of the Feathers or Other Parts of Federally Protected Birds for Tribal Cultural
and Religious Purposes (Oct. 12, 2012) [hereinafter "DOJ Policy"] (committing to the same
policy).  However, these policy statements do not have the force of law and can be rescinded at
any time.  Ultimately, this leaves Native religious practitioners in as vulnerable a position as they
were before the promulgation of these policy statements.  As such, the Court finds that the exercise
of prosecutorial discretion cannot remediate discriminatory black letter law.

segregable from the evidence to be presented at trial.  *Id.*  Additionally, the motion rests on the origin of the feathers charged in the Superseding Indictment—an extra-indictment fact to which parties stipulated.  Mot. Hr'g Tr. at 13:7–15; 14:25–15:6; 227:6–17.  Finally, the government makes no objection to the Court's consideration of these facts.  *Pope*, 613 F.3d at 1260.  Thus, the Court can rule on the ultimate question of law, which is whether the government failed to state an offense in the indictment.  *See* Fed. R. Crim. P. 12(b)(3)(B)(v).

As discussed *supra*, the Court finds that Mr. Skeet has a usufructuary right to sell and offer to sell migratory birds and bird feathers pursuant to the 1868 Navajo Treaty.  This finding is based on evidence presented by the parties in their briefing and at the motion hearing, as well as historical records documenting the history of the treaty and treaty negotiations, of which the Court takes judicial notice.  The Court additionally finds that because Mr. Skeet is an enrolled member of the Navajo Nation and the migratory bird feathers which he is alleged to have sold or offered to sell are from within the boundaries of the Naabeehó Bináhásdzo, he is entitled to assert this treaty right as an affirmative defense.  Finally, having found this treaty right, the Court finds that it was neither abrogated nor otherwise permissibly regulated by the Migratory Bird Treaty Act.

Accordingly, because Mr. Skeet's treaty right insulates him from prosecution under the MBTA, the Court therefore finds his motion to dismiss meritorious.  Indeed, "[i]t is perfectly proper, and in fact mandated, that the district court dismiss an indictment if the indictment fails to allege facts which constitute a prosecutable offense."  *United States v. Coia*, 719 F.2d 1120, 1123 (11th Cir. 1983).  Accordingly, the Court will dismiss Counts 1, 2, 3, 5, 6, and 7 of the Superseding Indictment—each of which charges a violation of the MBTA—for failure to state an offense.  *See* Fed. R. Crim. P. 12(b)(3)(B)(v); Doc. 44.

In making this finding, the Court reaffirms the sovereignty of the Diné.  At the motion

hearing, the government argued that such a ruling would be an affront to tribal sovereignty.  Mot. Hr'g Tr. at 224:25–225:4.  But this assertion misapprehends the impact of this ruling.  In finding that Mr. Skeet has a right to sell migratory bird feathers, this Court honors the Diné's sovereignty by affirming their autonomy to manage their resources as they see fit.  Given the Diné's long history of effective stewardship prior to colonization, there is little reason to think that affirming this treaty right would lead to mismanagement now.  Moreover, given the Navajo Nation's numerous laws, regulations, and policies regulating the taking and possession of migratory birds and bird parts, the Court is confident that the Navajo Nation is capable of both responding to the conduct alleged here and achieving its long-term, resource-management goals.

## II.    Religious Freedom

Mr. Skeet also moves to dismiss Counts 1 and 2 of the original Indictment (now Counts 1 and 4 in the Superseding Indictment), arguing that both the MBTA and the BGEPA constitute impermissible infringements on his free exercise of religion under the Religious Freedom Restoration Act ("RFRA").  Doc. 27 at 8; Doc. 43.  The RFRA provides that the "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability."  42 U.S.C. § 2000bb-1(a).  "To make out a prima facie RFRA defense, a criminal defendant must show by a preponderance of the evidence that government action (1) substantially burdens (2) a religious belief, not merely a philosophy or way of life, (3) that the defendant sincerely holds."  *United States v. Quaintance*, 608 F.3d 717, 719 (10th Cir. 2010) (citing *United States v. Meyers*, 95 F.3d 1475, 1482 (10th Cir. 1996)); *see also Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 428 (2006).  The burden then shifts to the government to show that the burden to the person "(1) is in furtherance of a compelling governmental interest[] and (2) is the least restrictive means of furthering that compelling

27

governmental interest." 42 U.S.C. § 2000bb-1(b).

Each element of the RFRA defense requires extensive fact-finding and bears directly on Mr. Skeet's guilt. For example, to determine whether Mr. Skeet proved the first element of his defense (*i.e.*, whether he had a sincere religious belief) would require the Court to determine a number of factual sub-issues, including (1) whether Mr. Skeet's belief is based in the Diné religious tradition,[7] the Native American Church religious tradition,[8] or both[9]; (2) whether Mr. Skeet believes that selling feathers is a religious practice itself or whether he simply believes that feathers are integral to the practice of his religion[10]; (3) whether Mr. Skeet's purported economic and religious motivations existed concurrently[11]; and (4) how these issues bear on the sincerity of

---

[7] *See, e.g.*, *Ross v. The Bd. of Regents of The Univ. of New Mexico*, 599 F.3d 1114, 1118 (10th Cir. 2010) (recognizing the Navajo religion); *Badoni v. Higginson*, 638 F.2d 172, 177 (10th Cir. 1980) (same).

[8] *See, e.g.*, *Toledo v. Nobel-Sysco, Inc.*, 892 F.2d 1481, 1485–86 (10th Cir. 1989) (recognizing the Native American Church as "a bona fide religion" that "combines elements of Christianity with traditional Native American beliefs and the use of peyote").

[9] *See, e.g.*, *United States v. Brown*, 50 F. App'x 970, 971 (10th Cir. 2002) ("He was a 'road man' for the Native American Church and a medicine man for the traditional Navajo religion.").

[10] *See, e.g.*, *United States v. Hugs*, 109 F.3d 1375, 1378 (9th Cir. 1997) (finding that "eagles and eagle parts play a central role in the practice of Native American religions," and that the BGEPA therefore "imposed a substantial burden on the practice of such religions by restricting the ability of adherents to obtain and possess eagles and eagle parts"); *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 282 F. Supp. 2d 1236, 1252 (D.N.M. 2002), *aff'd*, 342 F.3d 1170 (10th Cir. 2003), *on reh'g en banc*, 389 F.3d 973 (10th Cir. 2004), *aff'd and remanded sub nom. Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006) (finding that the government had conceded that members of the O Centro Espirita Beneficente Uniao Do Vegetal church were engaged in a sincere exercise of their religion when they illegally imported "*hoasca*"—a controlled substance containing DMT—in order to engage in its sacramental use).

[11] *See, e.g.*, *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1135 (10th Cir. 2013), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) (clarifying that economic and religious motives are not mutually exclusive and reasoning that "sincerely religious persons could find a connection between the exercise of religion and the pursuit of profit"). *But see United States*

his professed beliefs.[12]

In *Pope*, the Tenth Circuit considered a similarly factually intensive defense, finding that the trial court could not decide Mr. Pope's motion to dismiss because "Mr. Pope seeks to vindicate an affirmative defense bearing directly on his guilt or innocence." *Pope*, 613 F.3d at 1261.  The Tenth Circuit noted that Mr. Pope's motion presented an as-applied, rather than facial, challenge to 18 U.S.C. § 922(g)(9); as such, it found that his argument was based on "the facts surrounding the commission of the alleged offense—the very facts a court may *not* consider before trial."  *Id.* (citations and quotations omitted).

Given the plain language of Rule 12(b), the controlling case law in *Pope*, as well as the bedrock Sixth Amendment right to trial by a jury of one's peers, the Court finds that Mr. Skeet's RFRA defense cannot be resolved on a pretrial motion.  First, because Mr. Skeet's RFRA defense implicates primarily factual rather than legal issues, the Court finds that this defense is "territory reserved to the jury as the ultimate finder of fact in our criminal justice system." *Pope*, 613 F.3d at 1259.  Additionally, because the RFRA defense goes to the ultimate issue of Mr. Skeet's guilt, it would require a trial on the merits of the case—a prospect that is proscribed by Rule 12(b)(1) and that disserves judicial economy.  *Id.*; Rule 12(b)(1).  Nevertheless, Mr. Skeet is welcome to assert a RFRA defense at trial.

## CONCLUSION

For the reasons stated above, Mr. Skeet's Motion to Dismiss [Doc. 27] is hereby **GRANTED IN PART**.  The Court hereby dismisses Counts 1, 2, 3, 5, 6, and 7 of the Superseding

---

*v. Sandia*, 188 F.3d 1215, 1218 (10th Cir. 1999) (finding that a defendant could not establish sincere religious belief where a later economic motive supplanted a prior religious motive).

[12] *See, e.g.*, *Yellowbear v. Lampert*, 741 F.3d 48, 54 (10th Cir. 2014); *United States v. Quaintance*, 471 F. Supp. 2d 1153, 1171 (D.N.M. 2006), *aff'd*, 608 F.3d 717 (10th Cir. 2010).

Indictment [Doc. 44] for failure to state an offense, pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v).

ENTERED this 26th day of August 2022.

_____

MARTHA VÁZQUEZ
SENIOR UNITED STATES DISTRICT JUDGE